IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MORE CUPCAKES, LLC, | ) | |
| | ) | Civil Action No. 09cv3555 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Charles P. Kocoras |
| | ) | |
| LOVEMORE LLC, ANGELA B. CROSSMAN, | ) | Magistrate Judge Valdez |
| AND ANDREA R. CROSSMAN, | ) | |
| | ) | |
| Defendants. | ) | |

_____:::

MORE CUPCAKES' MEMORANDUM IN OPPOSITION TO THE MOTIONS OF
LOVEMORE AND THE CROSSMAN DEFENDANTS TO DISMISS OR TRANSFER THIS CASE

John R. Crossan
CROSSAN INTELLECTUAL PROPERTY LAW, LLC
70 W. Madison St., #5050
Chicago, IL 60602-4214
312-602-1071
Fax: 312-264-0770
jrc@crossaniplaw.com

TABLE OF CONTENTS

Table of Authorities ................................................................................................ iii

Attached Exhibits ................................................................................................... iv

I.    THIS COURT HAS PERSONAL JURISDICTION OVER ALL THE
      DEFENDANTS ................................................................................................ 2

      A.    Defendants' Targeting More in Illinois and Operating Their Internet Web
            Site Provide Specific Personal Jurisdiction Here.............................................. 2

            1.    The Crossman Sisters Personally Filed as "Owners" to Register
                  LOVEMORE in an Intent-to-Use Filing, With No Claim of Prior
                  Use of the Mark in Commerce. ................................................................. 2

            2.    The Crossman Sisters Knew of More and its Trademark Application
                  by Early September, 2008............................................................................ 3

            3.    The Defendants Commenced Use of the LOVEMORE mark in the
                  Face
                  of The Sisters' Knowledge of More's Superior Rights in the Same
                  Mark .......................................................................................................... 3

            4.    Defendants' Web Site Could Have Been, but Never Was, Restricted
                  from Access by Illinois Users.................................................................... 4

            5.    The Crossman Sisters Themselves Shipped LOVEMORE Shirts to
                  Illinois ...................................................................................................... 5

            6.    The Crossman Sisters Sought Personally to Oppose More's
                  Application
                  to Register LOVE MORE for its T-shirts, but Determined After
                  Much Delay Not To Do So ........................................................................ 6

            7.    The Crossman Sisters Belatedly Dropped their Threatened
                  Opposition,
                  and More's Registration of LOVE MORE for T-shirts was Issued ...... 7

            8.    As Proof of Defendants' Continued Targeting of Illinois, Defendants
                  Shipped to Counsel's Secretary Here an Order of LOVEMORE T-
                  shirts ........................................................................................................ 7

- i -

     **B.**    **These Multiple Contacts by Defendants with Illinois Subject Them to the Specific Personal Jurisdiction of this Court in this Matter** ............................. 8

         **1.**    **This Court's *Gencor* and *Euromarket* Case Discussions Support a Finding of Jurisdiction Here** ...................................................... 9

         **2.**    **Controlling Cases Urge a Finding of Personal Jurisdiction Here Based on the Injury Caused in the Forum District** ............................. 10

         **3.**    **The Leading *Zippo* case Supports Jurisdiction over Defendants Here** ................................................................................................ 14

         **4.**    **Other Illinois Cases on Jurisdiction over Remote Actors in Trademark Matters Support Jurisdiction Here** ............................................. 15

         **5.**    **Defendants' Foreign Cases are Inapposite** ................................................. 15

         **6.**    **Personal Jurisdiction over All the Defendants Should be Found Here** ................................................................................................ 16

**II.**    **THE CROSSMAN SISTERS SHOULD REMAIN IN THE CASE** ........................... 16

     **A.**    **No "Fiduciary Shield" Applies Here to the Founders and Managers of Lovemore, LLC, who Exercise Discretion in Lovemore's Operations** ......... 16

     **B.**    **A Cause of Action Clearly is Stated Against the Crossman Sisters** ............... 19

**III.**    **THIS ACTION SHOULD NOT BE TRANSFERRED TO BROOKLYN** ................ 20

**CONCLUSION** ...................................................................................................... 22

TABLE OF AUTHORITIES

## CASES

*Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007) ................................................................ 19

*Brujis v. Shaw*, 876 F.Supp. 975, 980 (N.D. Ill., 1995) ................................................................ 16

*Bunn-O-Matic Corp. v. Bunn Coffee Services, Inc.*, 1998 U.S.Dist LEXIS 7819
(C.D.IL March 31, 1998) ........................................................................................................ 14

*Calder v. Jones*, 465 U.S. 783 (1984) ................................................................ 10, 11, 13, 18

*Clipp Designs, Inc. v. Tag Bags, Inc.*, 996 F.Supp. 766 (N.D. IL 1998) ................................ 14, 17

*Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F.Supp.2d 824 (N.D. Ill., 2000) ................. 9

*Gencor Pacific, Inc. v. Nature's Thyme, LLC* (April 24, 2007, no. 07 C 167) .................... 8, 9, 14

*Graduate Management Admission Council v. Raju*, 241 F.Supp.2d 589 (E.D.VA 2003) ........... 15

*Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership*,
34 F.3d 410 (C.A.7 1994) ................................................................................................ 11, 13

*Janmark, Inc. v. Reidy*, 132 F.3d 1200 (C.A.7 1997) ................................................ 11, 12, 13

*Lindgren v. GDT, LLC*, 312 F.Supp.2d 1125, 1131 (S.D. IA 2004) .......................................... 14

*Richter v. Instar Enterprises Intern, Inc.*, 594 F.Supp.2d 1000, 1008 (N.D. Ill., 2009) .............. 10

*Rollins v. Ellwood*, 141 Ill.2d 244 (1990) ................................................................................ 17

*Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503-04 (C.A.7 1992) ............................................ 4

*Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119
(W.D. Pa. 1997) ............................................................................................ 9, 13, 14, 15

*Zurich Capital Markets, Inc. v. Coglianese*, 388 F.Supp.2d 847, 860 (N.D. Ill., 2004) .............. 17

## STATUTES

15 U.S.C. § 1051(b) ........................................................................................................................ 3

15 U.S.C. § 1057(c) ...................................................................................................................... 19

15 U.S.C. § 1115(b)(5) ................................................................................................................. 20

28 U.S.C. § 1404(a) ...................................................................................................................... 19

28 U.S.C. § 1404 ............................................................................................................................. 1

## OTHER AUTHORITIES

Spencer, A. Benjamin, "Jurisdiction and the Internet: Returning to Traditional Principles to
Analyze Network-Mediated Contacts", University of Illinois Law Review, 2005, Available at
SSRN: http://ssrn.com/abstract=706629 ................................................................................ 4, 8

## RULES

Rule 12(b)(6), F.R.Civ.P. ............................................................................................................. 19

Rule 4(k)(2), F.R.Civ.P. ............................................................................................................... 15

Rule 408, Fed.R.Ev. ....................................................................................................................... 6

ATTACHED EXHIBITS

Ex.

More's Registration Certificate for its LOVE MORE trademark, for "T-shirts" --------------------- 1

The Crossman Sisters' Application to register LOVEMORE trademark for "shirts" -------------- 2

Suspension September 4, 2008, of the Crossman Sisters' TM Application in view of More's ---- 3

Lovemore's Facebook page, stating on Sept. 13, 2008 that the "dream" is "soon to come" ------- 4

Excerpted report by Andrea Crossman of a business meeting with Angela ------------------------ 5

Appointment of Philadelphia counsel for the Sisters' Application, October 9, 2008 -------------- 6

Philadelphia Counsel's Letters to More Counsel (Settlement discussion deleted) ---------------- 7A

Crossman Sisters' E-mail letters to More's Manager -------------------------------------------- 7B

Philadelphia Counsel's final Letter to More's counsel (Settlement discussion deleted)---------- 7C

Termination of Crossman Sisters' Proposed Opposition to More's TM Application -------------- 8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MORE CUPCAKES, LLC, | ) | |
| | ) | Civil Action No. 09cv3555 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Charles P. Kocoras |
| | ) | |
| LOVEMORE LLC, ANGELA B. CROSSMAN, | ) | Magistrate Judge Valdez |
| AND ANDREA R. CROSSMAN, | ) | |
| | ) | |
| Defendants. | ) | |

_____::::

MORE CUPCAKES' MEMORANDUM IN OPPOSITION TO THE MOTIONS OF
LOVEMORE AND THE CROSSMAN DEFENDANTS TO DISMISS OR TRANSFER THIS CASE

Plaintiff, More Cupcakes, LLC, respectfully opposes the motions of the Defendants, filed August 4, corrected on August 10, and heard for scheduling on August 12, 2009.

Briefly, Defendants' motions in all their parts should be denied in view of the full set of pertinent facts and the current law on personal jurisdiction arising from causing injury in the forum and on trademark infringement accomplished via Internet sales. First, Defendants in their memorandum ("memo") and attachments fail to acknowledge any of many important facts subjecting each of them to jurisdiction in this District. Further, Defendants the Crossman sisters fail to acknowledge, in contradiction of their motion that they be individually dismissed from this case, their personal actions as individuals in exercising discretion even as founders and managers of the Lovemore LLC entity. Last, in contradiction of the alternative motion to transfer this case under 28 U.S.C. §1404, Defendants fail to recognize that it is solely the two principals, the Crossman sisters, who know of their causing injury to Plaintiff in Illinois.

- 1 -

The Defendants' motions, in each of their parts, should be denied for the reasons and on the authorities shown herein, so that the case may proceed on the merits.

## I. THIS COURT HAS PERSONAL JURISDICTION OVER ALL THE DEFENDANTS

Defendants' memorandum argues as if each of the Defendants is operating solely in Brooklyn, totally absent any interaction with or impact on More Cupcakes, LLC ("More") outside of Brooklyn.  This argument is palpably wrong.  As the facts below and the case authorities make clear, what each of the Defendants has done in regard to (1) adoption and use of the LOVEMORE trademark in commerce in the face of More's now-acknowledged prior rights and (2) their operation of their active and interactive website subjects each of the Defendants to specific personal jurisdiction in the Illinois courts.

### A. Defendants' Targeting More in Illinois and Operating Their Internet Web Site Provide Specific Personal Jurisdiction Here

### 1. The Crossman Sisters Personally Filed as "Owners" to Register LOVE-MORE in an Intent-to-Use Filing, With No Claim of Prior Use of the Mark in Commerce.

The Crossman sisters say they selected their LOVEMORE trademark for T-shirts prior to May 2008 (Defendants' Crossman Decl'n, ¶ 25), but they admit that they neither filed to register the mark nor used the mark in commerce before May 15, 2008.  That is the date that More filed its own, ultimately successful, intent-to-use application for federal registration of the LOVE MORE mark for T-shirts (Ex. 1 hereto).  Only later, on May 19, 2008, did the Crossman sisters file personally, by one of them, as "owners", an intent-to-use application for federal registration of the same LOVEMORE mark for "shirts" (Ex. 2 hereto).  Defendant Lovemore LLC was not yet then in existence as a New York Limited Liability Company.

Had the Crossman sisters felt that they had any cognizable use of their mark in commerce (see 15 U.S.C. §1127, "The term 'use in commerce' means …") prior to May 19, 2008, they would have filed their application for federal trademark registration under 15 U.S.C. § 1051(a) together with a statement of use of the mark in U.S. commerce and a specimen showing such use of their mark in that commerce on "shirts" on or prior to their filing date. Rather, the Crossman sisters' application (Ex. 2) was filed expressly as an intent-to-use application under 15 U.S.C. § 1051(b), with no suggestion of prior use of their mark on the goods in commerce.

**2. The Crossman Sisters Knew of More and its Trademark Application by Early September, 2008**

The Crossman sisters were confronted with More's earlier-filed application to register LOVEMORE for T-shirts by a Trademark Office action (Ex. 3) of September 4, 2008, that was mailed to Angela Crossman as correspondent for the application. The sisters' application for federal registration of the LOVEMORE mark for shirts was then officially suspended from further prosecution in view of More's earlier-filed application, the date and location of which are specifically identified in an attachment to the Office Action (see the last 2 pages of Ex. 3).

**3. The Defendants Commenced Use of the LOVEMORE mark in the Face of The Sisters' Knowledge of More's Superior Rights in the Same Mark**

Despite their knowing of More's conflicting, earlier-filed application to register LOVE-MORE since soon after September 4, 2008, and knowing of More's Illinois location from the Trademark Office action attachment, the Crossman sisters nonetheless only then ordered a batch of LOVEMORE-marked T-shirts for their first sales in commerce. This first ordering was captured in their Facebook posting of September 13, 2008, at 8:13 pm, presented in Ex. 3 to More's Complaint (and as Ex. 4 hereto). In that posting, "Lovemore" stated,

> *"As we get closer to launching the Lovemore dream*, we've created this
> new & improved Lovemore Facebook Page to keep you up-to-date &
> hopefully as excited as we are for *what is so soon to come!"*

[emphases added.]  "So soon to come" cannot mean "already in use in commerce".  Indeed,
Defendants' listing of witnesses (memo, at 16-17) suggests that Lovemore's T-shirt sales catalog
was not even available until much later – November 2008 at the earliest.  "Launching the dream"
does not refer to founding Lovemore LLC, as that already was done by September 2008.

Since the Lanham Act was amended to its present form, at a time well before 2008,
"token use" of a trademark, i.e., putting a desired trademark on one or a few examples of a
similar product and shipping it interstate to a friend or relative, and even "collecting" a token fee,
is ***not*** a trademark use sufficient to sustain an application or registration.  Rather, sufficient "use
in commerce" means *commercial scale* use, in such quantities and on such terms as are normal
for the industry or trade involved.  *Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 503-04 (C.A.7
1992).  Certainly Defendants had no such "commercial scale" sales in or prior to September
2008 in view of the admission on their Facebook page.

### 4. Defendants' Web Site Could Have Been, but Never Was, Restricted from Access by Illinois Users

Defendants, the Crossman sisters, had obtained their web site URL www.chooselove-
more.com as early as December 2007, for use in their contemplated business.  When the sisters'
site went "live" is unknown, but certainly since going live it has always been accessible freely in
and from Illinois.  Defendants have never implemented known and available geographical
screening or "blocking" software to avoid impacting states, such as Illinois, where sales of the
LOVEMORE LLC products cause damage to others.  See, e.g., findings in an article by Spencer,
A. Benjamin, "Jurisdiction and the Internet: Returning to Traditional Principles to Analyze

- 4 -

Network-Mediated Contacts", University of Illinois Law Review, 2005, available at SSRN: http://ssrn.com/abstract=706629, at p. 23, notes 128-131:

> If a Web publisher wishes to restrict the global availability of its content to a more limited geographical area than otherwise results from simply posting information on the Internet, a whole host of geographic mapping technologies[128] enables the site operator to limit access. The technology exists to identify the geographical location of prospective users (for example, through the user's IP address[129] or digital certificates[130]) and to deny entry to undesirable users.[131]

(footnote texts omitted.) Although such restrictions can be circumvented by knowledgeable Internet users (we have never used any circumvention technique in accessing the chooselovemore.com site), the Defendants' failure even to *try* to restrict Illinois users' access to Lovemore's interactive website is fatal to their present motion. Defendants are selling their T-shirts without restriction. Coupled with their admitted routine sale and shipping of at least *two* orders of T-shirts to addresses in Illinois (memo, p. 2, n.1), Defendants' lack of concern with the damage they have caused to More in this District by their knowing infringement of More's LOVE MORE trademark subjects them to jurisdiction here, where their injury is targeted.

### 5. The Crossman Sisters Themselves Shipped their LOVEMORE Shirts to Illinois

Significantly, the Crossman sisters themselves do the order taking, credit card collection, folding, wrapping, and shipping of their infringing LOVEMORE T-shirts. See an Internet report on a week's diet activities by Defendant Andrea Crossman, referring to a business session with her sister Angela, at > http://www.welikeitraw.com/rawfood/2009/07/my-way-andrea-crossman.html < , containing the following admission (see Ex. 5):

> **Wednesday**
>
> I got up … and packed food and sundries to head over to Angela's.
>
> … After lunch we checked in a delivery of new stock. …. *Once all was unpacked we got to flip 'n folding. It is amazing how as an entrepreneur*

> *you truly do everything.* While we were flipping right, then left, then up,
> we talked about ….

(emphasis added.)  Certainly in packing and addressing each shipment, the sisters see where their

T-shirts are headed.  Thus, despite their current plea that their activities are not targeted to

Illinois or against Plaintiff More, they intercepted neither shipment of LOVEMORE T-shirts

going to Illinois.  They easily could have done so then, if not before – but they did not.

### 6. The Crossman Sisters Sought Personally to Oppose More's Application to Register LOVE MORE for its T-shirts, but Determined After Much Delay Not To Do So

After they learned in early September 2008 of More's prior filing for exclusive rights in

the LOVE MORE trademark for T-shirts, the Crossman sisters from October 2008 to March

2009 made repeated threats against More related to the LOVE MORE mark.  The first threats

were sent to More's counsel in Illinois by Defendants' then-newly-retained Philadelphia counsel

(Exs. 6, 7A); the next by each of the Crossman sisters directly to the manager of More Cupcakes

in Chicago (Ex. 7B), and, last, a shot by Defendants' counsel to More's counsel (Ex. 7C).

Letters and/or e-mail of November 17 and December 24, 2008, and of January 9, 2009,

were sent by Defendants' counsel to More's counsel (at his prior firm).  These were sent

specifically *not* on behalf of Lovemore LLC but for "*the founders and owners* of the

LOVEMORE … venture" (emphasis added) (Ex. 7A hereto presents just the identifying top and

signature parts of the communications, since the letters otherwise are in the nature of Rule 408,

Fed.R.Ev., missives).

On February 4 and 5, 2009, Andrea and then Angela Crossman sent e-mails to "info@-

morecupcakes.com", More's general e-mail address as posted on its web site.  Each e-mail

sought to gain some rights to the LOVE MORE mark prior to expiration of the sisters' time for filing the proposed Opposition to More's trademark registration application (Ex. 7B).

A final letter of March 25, 2009, was sent by Defendants' counsel to More's counsel, again expressly on behalf of Andrea and Angela Crossman and *not* for Lovemore LLC, in Illinois, which made infringement charges and demands for certain relief, and again was characterized as a "settlement offer" (Ex. 7C).

### 7. The Crossman Sisters Belatedly Dropped their Threatened Opposition, and More's Registration of LOVE MORE for T-shirts was Issued

On February 11, 2009, the Defendant sisters' time to file an Opposition to More's application for registration of the LOVEMORE mark expired -- without any filing by Defendants.  By the end of February, 2009 the sisters' potential Opposition in the US Trademark Trial and Appeal Board was formally terminated (Ex. 8).  After normal processing by Trademark Office personnel, More's registration of its LOVEMORE mark for T-shirts was issued on June 2, 2009 (Ex. 1) – a delay of several months during which Defendants made continuing sales of their T-shirts under the infringing LOVEMORE mark.

### 8. As Proof of Defendants' Continued Targeting of Illinois, Defendants Shipped to Counsel's Secretary Here an Order of LOVEMORE T-shirts

As a result of More's counsel's secretary's ordering on-line and receipt of three of Defendants' LOVEMORE T-shirts, in Illinois, it was determined that Defendants indeed were targeting Illinois via their website and were happy to ship infringing T-shirts into Illinois – even after the federal registration of More's mark was duly issued.  That Defendants shipped an order – indeed a *second* order – into Illinois without hesitation or restriction demonstrates their

targeting of Illinois and their willingness to do business here despite knowing of the injury to More here.[1]

This suit for Defendants' willful infringement of More's rights was filed on June 9, 2009, soon after receipt of those T-shirts. Present counsel of record for Defendants, *four* attorneys at Chicago's Pattishall firm, have appeared for Defendants without reservation. An extension of time for an Answer to the June 9 Complaint was agreed to with such counsel; the motions opposed here were filed on the due date and noticed for a scheduling hearing a week later.

### B. These Multiple Contacts by Defendants with Illinois Subject Them to the Specific Personal Jurisdiction of this Court in this Matter

More does not propose that the Court consider whether it has general jurisdiction over Defendants for any and all matters (see Defs' memo, pp. 4-5). Rather, More shows, as above, that each of the Defendants has been and is, by its or her actions, both (1) willfully directing infringement injuries at More in Illinois and (2) using their commercially active and interactive web site to sell infringing T-shirts in Illinois without restriction. Each action submits the Defendants and each of them to the specific personal jurisdiction of this Court for their trademark infringement and unfair competition.

Personal jurisdiction of a federal district court over those who cause injury in the forum state by use of a remote but active or interactive commercial web site on the Internet, and over

---

[1]   More's counsel's contact indirectly with Defendants, through his secretary and via an Internet ordering page, was far less intrusive, with no concealed personal confrontation, than was Defendants' prior counsel's apparently sending two attorneys, agents, or employees, on June 16, 2009, soon after this action was filed, into More Cupcakes' bakery at 1 E Delaware St., Chicago. They asked at the counter there to buy a LOVE MORE T-shirt. Told that the bakery was then momentarily out of stock of such shirts but that a LOVE MORE T-shirt indeed could be obtained there the next day, the two left, without even buying a cupcake or two. They seem not to have returned to complete their T-shirt purchasing mission.

similar actors, has been a continuing concern of the courts for many years. See generally Spencer, *supra*, at pp. 6-17 thereof.

### 1. This Court's *Gencor* and *Euromarket* Case Discussions Support a Finding of Jurisdiction Here

This Court apparently dealt most recently with a personal jurisdiction issue based on Internet presence in *Gencor Pacific, Inc. v. Nature's Thyme, LLC* (April 24, 2007, no. 07 C 167). In *Gencor*, this Court considered whether it should exercise personal jurisdiction over a New Jersey firm and its organizers at the behest of a Texas corporate plaintiff on grounds of mere accessibility here of defendant's website. The web site did not reproduce the claimed copyrighted material, however, and so jurisdiction here was denied.

Nonetheless, this Court's *Gencor* ruling includes a helpful guide for considering personal jurisdiction issues arising from an active or interactive website, slip op. at pp. 11-12. This Court recognized in *Gencor*, for instance, that Illinois courts use the "sliding scale" approach of the often-cited *Zippo* case, *infra*, to assess the significance of contacts with the forum state. Thus, jurisdiction depends on the performance of the site: e.g., transacting a "significant amount of business over the internet" confers jurisdiction if, as here, Illinois residents actually use the site and make purchases (although not found in *Gencor*).

Magistrate Judge Denlow earlier provided a thorough survey of the evolving law of personal jurisdiction over remote actors infringing locally-held trademarks, in *Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F.Supp.2d 824 (N.D. Ill., 2000). There the Irish defendant ("Limited") had adopted the "Crate & Barrel" name and trademarks of the Chicago-based chain of home furnishings stores ("EDI") and set up a worldwide Internet presence based in Ireland. EDI sued in Chicago, and also in Ireland and London, to stop the infringement, and

Limited moved in Chicago to dismiss for lack of personal jurisdiction. The Court assessed each and all the factors governing personal jurisdiction over the foreign defendant and denied dismissal of the case. Limited's active targeting of plaintiff by adopting the identical name and style of plaintiff's well-known trademarks and its establishing an active web site accessible in Illinois[2] were principal factors cited in denying the motion.

The Chicago case thus was permitted to proceed. *Euromarket Designs* has been cited favorably by courts' decisions in this District and elsewhere, as in *Richter v. Instar Enterprises Intern, Inc.*, 594 F.Supp.2d 1000, 1008 (N.D. Ill., 2009) (distinguishing *Euromarket* as involving a sale to an Illinois consumer).

### 2. Controlling Cases Urge a Finding of Personal Jurisdiction Here Based on the Injury Caused in the Forum District

The governing case for personal jurisdiction over remote actors causing local tort injury is *Calder v. Jones*, 465 U.S. 783 (1984), cited by Defendants in support of their plea that this case does not involve "intentional tortuous actions from untargeted negligence"[3] (memo, p. 7). In *Calder*, an author and the president and editor working in Florida for The National Enquirer researched and wrote or edited and approved in Florida an allegedly libelous article about Ms. Jones. The article was then circulated in Ms. Jones' home state of California, which was also the center of her professional life. The California Court of Appeals found personal jurisdiction over

---

[2]   In this EDI case, plaintiff's lawyer's secretary ordered in Illinois via the Internet from Defendant several beaded drink coasters, for delivery in Ireland (ordering for direct shipment into the USA was not possible). The order was duly filled, and this was held an added, sufficient basis for finding interaction with Illinois, besides the targeting of trademark injury to Illinois.

[3]   Whatever that may mean, even correcting "tortuous" to – tortious – .

the two individuals, who then appealed (taken as a petition for certiorari), stating – as Defendants do here – that they had no contacts with California but were mere employees of the publication.

The Supreme Court in *Calder* held that since the alleged defamatory injury was directed at Ms. Jones in California, and the individual defendants knowingly contributed to causing the injury, the courts in the place of the injury had personal jurisdiction over them. At 465 U.S. 789-90, the Supreme Court reasoned as follows:

> … [T]heir intentional, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works…. Under the circumstances, petitioners must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article. [citations omitted] *An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California.*

[emphasis added.]

Similarly, in both *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership.*, 34 F.3d 410 (C.A.7, 1994), and *Janmark, Inc. v. Reidy*, 132 F.3d 1200 (C.A.7 1997), our Court of Appeals has held remote infringers to personal jurisdiction in federal courts in Indiana and Illinois.

In *Colts*, the NFL team that had played successfully in Baltimore as the Baltimore Colts (after moving there from an unsuccessful time in Los Angeles as the LA Colts) moved to Indianapolis and took up the name "Indianapolis Colts". The Canadian Football League then formed a new team in Baltimore, the "Baltimore CFL Colts"; its games were televised on cable TV and so were shown in Indiana. Its logoed merchandise, with the CFL part diminished in relative size or blurred, was to be sold throughout the US and Canada, although not yet in

- 11 -

Indiana. The NFL and the Indianapolis team sued for an injunction. Judge Posner held the Baltimore team subject to jurisdiction in the Indiana federal court, since that was the place of the injury from the willful selection of the Colts name for the new Baltimore football team:

> The Indianapolis Colts use the trademarks they seek to defend in this suit mainly in Indiana. If the trademarks are impaired, as the suit alleges, the injury will be felt mainly in Indiana. By choosing a name that might be found to be confusingly similar to that of the Indianapolis Colts, the defendants assumed the risk of injuring valuable property located in Indiana. Since there can be no tort without an injury, … the state in which the injury occurs is the state in which the tort occurs, and someone who commits a tort in Indiana should, one might suppose, be amenable to suit there. This conclusion is supported by the Supreme Court's decision [in] *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), holding that the state in which the victim of the defendant's defamation lived had jurisdiction over the victim's defamation suit.

34 F.3d at 411-12. (one citation omitted) Judge Posner continued:

> … In *Calder* as in all the other cases that have come to our attention in which jurisdiction over a suit involving intellectual property (when broadly defined to include reputation, so that it includes *Calder* itself) was upheld, the defendant had done more than brought about an injury to an interest located in a particular state. The defendant had also "entered" the state in some fashion, as by the sale (in *Calder*) of the magazine containing the defamatory material. Well, we have that here too, because of the broadcasts, so we needn't decide whether the addition is indispensable. The bulk of the Indianapolis Colts' most loyal fans are, no doubt, Hoosiers, so that the largest concentration of consumers likely to be confused by broadcasts implying some affiliation between the Indianapolis Colts and the Baltimore team is in Indiana. It is true that the defendants have not yet licensed the sale of merchandise with the name "Baltimore CFL Colts" on it in Indiana, but citizens of Indiana buy merchandise in other states as well.

34 F.3d at 412. On the same reasoning, the Defendants here, by choosing the LOVEMORE mark and then using it on the Internet in the face of More's known prior rights in that mark for T-shirts, and further selling and shipping their infringing T-shirts into Illinois, have made themselves amenable to suit here in Illinois.

- 12 -

In *Janmark*, a California maker of shopping carts had induced a New Jersey buyer to stop dealing with the Illinois plaintiff by making threats against the buyer that the Illinois carts would infringe the California maker's copyright in its own, similar carts. The Illinois competitor filed a declaratory judgment action in Illinois federal court against the California competitor. The injury from the tort of misrepresenting the carts as copyright protected occurred when the orders from the New Jersey buyer stopped coming to Illinois in view of the threats of suit and liability. Personal jurisdiction over the California company and its president was therefore held proper in Illinois. 132 F.3d, at 1202-03.

Similarly, here, the Defendant sisters proceeded to use the LOVEMORE mark in commerce on T-shirts after they knew of both More's priority right in the identical mark for the same goods and the finding by the US Trademark Office of confusing similarity between More's and Defendants' marks (Exs. 3, 4). These actions constitute Defendants' directing the "brunt of the injury" of infringing use of the mark against Plaintiff More in Illinois. Defendants here were not acting in a vacuum, but in a legal and commercial world in which their rights were authoritatively stated by the U.S. Trademark Office examiner to conflict with More's prior rights in the same mark for the same goods. The Defendants knew or should have known that their use of the LOVEMORE mark would directly conflict with More's rights in Illinois, particularly once More actually achieved registration of its mark. Since Defendants had sought to register the same mark for the same goods, they are estopped to deny the registrability of the mark to More, if only the formalities of the application process could be completed.

Under the holdings of *Calder*, *Colts*, and *Janmark*, and based on the facts before the Court, personal jurisdiction in this Court over each of the Defendants is both appropriate and "fundamentally fair".

- 13 -

### 3. The Leading *Zippo* case Supports Jurisdiction over Defendants Here

Widely cited is *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997), in which a federal district court in Pennsylvania heard an Internet domain name dispute couched in terms of alleged trademark infringement. Zippo Manufacturing ("ZM"), a Pennsylvania corporation, maker of Zippo-brand lighters, brought suit in its home district in Pennsylvania against Zippo Dot Com ("ZDC"), a California corporation. ZDC operated a website and Internet news service and used the domain names "zippo.com", "zippo.net", and "zipponews.com" on the Internet. ZM based its claims of infringement on ZDC's use of the Zippo trademark in its domain names, in numerous locations on its website, and in the heading of newsgroup messages posted by subscribers to ZDC's newsgroup. Defendant ZDC moved to dismiss the Pennsylvania action, arguing that its website was an insufficient basis for subjecting it to personal jurisdiction.

Rather than accept that defendant's Pennsylvania web presence alone sufficed to create the requisite minimum contacts between ZDC and Pennsylvania, the *Zippo* court took a new approach. The *Zippo* court crafted its "sliding scale" test, referred to by this Court in *Gencor*, *supra*. The *Zippo* test provides that the constitutionality of an assertion of personal jurisdiction directly relates to the "nature and quality of commercial activity that an entity conducts over the Internet." The categories of cases set by the *Zippo* court have come to be characterized as *active* (when the defendant clearly does business over the Internet), *passive* (purely informational sites), and *interactive* (sites exchanging information with users). Active and interactive web sites subject their operators to jurisdiction in locales where they cause injury to others.

- 14 -

**4. Other Illinois Cases on Jurisdiction over Remote Actors in Trademark Matters Support Jurisdiction Here**

Trademark cases in Illinois, as *Clipp Designs, Inc. v. Tag Bags, Inc.*, 996 F.Supp. 766 (N.D. IL 1998), have found personal jurisdiction in Illinois where internet orders were solicited by Illinois residents and fulfilled here by interstate shipments.  In *Bunn-O-Matic Corp. v. Bunn Coffee Services, Inc.*, 1998 U.S.Dist LEXIS 7819 (C.D.IL March 31, 1998), the defendant was found to have submitted to personal jurisdiction in Illinois because it was on notice that its use of the infringing BUNN mark on its website would cause injury in Illinois to plaintiff, an Illinois resident.

**5. Defendants' Foreign Cases are Inapposite**

In cases the Defendants cite (memo, pp. 6-7) where personal jurisdiction was not found, contacts with the forum as seen here were simply missing.  The cases relied on by Defendants do not detract from the force of the controlling cases cited above.

In the Iowa case of *Lindgren v. GDT, LLC,* 312 F.Supp.2d 1125, 1131 (S.D. IA 2004) (memo, pp. 7, 8), no orders by Iowa consumers were made and fulfilled until after suit was filed. Further, Defendant's application for federal registration of its trademark, JEAN JEWELS, was allowed without any finding of confusion with, or indeed any reference at all to, plaintiff's mark, JEAN JANGLES.  No indication appeared that defendant was aware of plaintiff's competing product or knew of any apparent conflict in the trademarks used, so personal jurisdiction was lacking.

Likewise, in the Virginia case of *Graduate Management Admission Council v. Raju*, 241 F.Supp.2d 589, 595 (E.D.VA 2003) (memo, p. 7), contacts with Virginia by the foreign defendant were found not to support personal jurisdiction.  Targeting of the entire USA,

- 15 -

however, under Rule 4(k)(2), F.R.Civ.P., was found in defendant's sales to U.S. customers and specific mentions of the USA on the defendant's web site. No "targeting" of plaintiff in Virginia was found, either.

### 6. Personal Jurisdiction over All the Defendants Should be Found Here

Defendants' www.chooselovemore.com site is not passive under the *Zippo* test but clearly at least is interactive and, indeed, is accurately described as active, since customers in Illinois have repeatedly interacted with it in ordering LOVEMORE T-shirts and having their orders confirmed and then shipped. Defendants consistently use the website to do business in Illinois over the Internet. Further, here, the Defendants have directed their activity willfully against More in Illinois through multiple actions as detailed in Sections IA and IIA above. Perhaps Defendants were trying to establish priority in common law rights, oblivious to the trumping effect of the impending issuance of More's first-filed-for federal registration.

This Court certainly has specific personal jurisdiction over both the Lovemore LLC entity and the Crossman sisters and each of them, since each has willfully targeted More in Illinois via their trademark dispute directed against More in Illinois and by their infringing promotion and sales activities on the Internet. Part I of Defendants' motion should be denied.

## II. THE CROSSMAN SISTERS SHOULD REMAIN IN THE CASE

### A. No "Fiduciary Shield" Applies Here to the Founders and Managers of Lovemore, LLC, who Exercise Discretion in Lovemore's Operations

Defendants argue that even if personal jurisdiction over Lovemore LLC is proper in this case, the Crossman sisters should be excused (memo, pp. 8-9). Defendants ignore the litany of discretionary actions – as set out in Sections IA and IIA above – that the Crossman sisters have chosen to take, both individually and on behalf of Lovemore LLC, in targeting More in Illinois

and selling their infringing T-shirts. Setting up a (likely thinly-capitalized[4]) limited liability company should not protect the sisters from liability for their personal, tortious conduct resulting from their personal agendas and actions in operating within and outside of Lovemore LLC in this matter.

The reasoning of *Brujis v. Shaw*, 876 F.Supp. 975 (N.D. Ill., 1995) (Moran, C.J), disposes of Defendants' contention. Shaw was President and principal shareholder of a company charged with racketeering violations. On Shaw's motion to dismiss himself and a fellow officer (Isgrigg) under the "fiduciary shield" doctrine, this Court held:

> Applying the fairness standard to the present case, we hold that the fiduciary shield doctrine should not protect Shaw and Isgrigg from this court's jurisdiction. Although the two men's contacts with Illinois were made in a representative capacity, Shaw owned the vast majority of USCB's shares and therefore stood to benefit personally from its activities in Illinois. ... More importantly, both Shaw and Isgrigg were senior corporate officers in a position to decide whether those contacts should be made at all. Brujis alleges that although [defendants] had been warned by the Federal Trade Commission of the deceptive nature of USCB's name, they "knew of, approved, authorized, and directed the use of the misleading name". ... In these circumstances we think it is fair and reasonable to subject Shaw and Isgrigg to our jurisdiction. They made a conscious decision to conduct business in Illinois through allegedly deceptive practices, and they must answer in Illinois for the consequences of that decision.

876 F.Supp. at 980. *Brujis* has been cited favorably in this Court, as in *Zurich Capital Markets, Inc. v. Coglianese*, 388 F.Supp.2d 847, 860 (N.D. Ill., 2004).

---

[4] Angela Crossman easily could have, but did not, show in her Declaration adequate capitalization of Lovemore LLC, so as to assure us that the entity is financially responsible and not judgment-proof, as its mere $8400 in sales to date suggests that it is. We independently sought such financial information via purchase of a Dun & Bradstreet report on the company, but we found no such report or even a rating for Lovemore LLC

Defendants' cases of *Rollins v. Ellwood*, 141 Ill.2d 244 (1990) (memo at 8), and *Clipp Designs, Inc. v. Tag Bags*, 996 F.Supp. 766,768 (ND IL 1998) (memo at 9), do not support dismissal here of the Crossman sisters. The Crossman sisters are not mere "employees" as was the individual defendant in *Rollins* -- a police officer, sent from Baltimore by his department to extradite an asserted fugitive arrested in Illinois. He was dismissed from the case as not personally liable for the false arrest or kidnapping torts charged by the plaintiff.

The Crossman sisters are here alleged to be "joint operators" of Lovemore in its business and "personally responsible for directing the business activities of Lovemore" and "willful infringers", unlike in *Clipp Designs*. In that case the court noted,

> [T]he [fiduciary shield] doctrine will not apply if the defendant is the alter ego of the entity for which he is a fiduciary. *Brujis,* 876 F.Supp. at 978-979. The fiduciary shield doctrine is an equitable doctrine and is, therefore, applied with discretion.

996 F.Supp, at 768. There, however, the plaintiff made no alter ego or sham entity allegations, as noted at 996 F.Supp at 768-69. Here, the Crossman sisters are the founders, sole employees, and managers of Lovemore LLC. and they exercise sole managerial and ownership discretion in all their acts respecting what Lovemore LLC does – including attacking More on its trademark position and infringing More'S LOVE MORE trademark by goods they ship personally to buyers in Illinois.

We recognize that Plaintiff has the burden of proof to show that personal jurisdiction over each of the Defendants is proper in this Court. This burden is carried in the Complaint, first at paragraph 4, where the statement is made that the Crossman sisters and "each of them is[ ] personally responsible for directing the business activities of Defendant Lovemore LLC including its infringement of Plaintiff's LOVE MORE mark for T-shirts." That burden is further

carried in paragraph 10 where the sisters are stated personally to "have willfully implemented a 'LOVEMORE' line of clothing including T-shirts and other products from a time after knowing of Plaintiff's pending superior statutory rights in the LOVE MORE mark for T-shirts."  The sisters further personally and via newly-retained Philadelphia counsel, in October 2008 to March 2009, made threats to Plaintiff of its infringing Defendants' mark (Exs. 7A and 7C hereto).  The sisters filed on their own, individual behalfs for two extensions of time to oppose granting of Plaintiff's trademark registration, as is stated in paragraph 15.  They gave up on that doomed course only after each beseeched Plaintiff's manager personally, via separate e-mails sent into Illinois (Ex. 7B hereto), to compromise somehow.  The sisters' personal actions caused Plaintiff months of delay in obtaining issuance of More's rightful trademark registration for the LOVE MORE mark (para. 17 of the Complaint).

Moreover, the Crossman sisters have persisted in causing further damage to More in Illinois by continuing to promote and sell their infringing LOVEMORE T-shirts via the web and to pack and ship them personally (Ex. 5) into Illinois.  The Crossman sisters have committed unfair competition with More, as stated in Count II, together with their Lovemore LLC entity.

The Crossman sisters' personally sending at least two shipments of LOVEMORE T-shirts into Illinois comprises a course of conduct that easily submits them to specific personal jurisdiction of this Court.  *Calder, supra.*

### B.   A Cause of Action Clearly is Stated Against the Crossman Sisters

Defendants' memo oddly asserts (pages 9-10) that no claim is stated against the Crossman sisters.  They yet more oddly cite *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007) - but that is specifically an anti-trust case, not a trademark infringement case, as here.  We

- 19 -

have shown above, in sections IA and IIA, the many specific complaints stated against the sisters and each of them; these are clearly sufficient under Rule 12(b)(6), F.R.Civ.P., to allege trademark infringement by them, acting individually and through Lovemore LLC.

The motion to dismiss the Crossman sisters, Part II of the motions, should be denied.

### III. THIS ACTION SHOULD NOT BE TRANSFERRED TO BROOKLYN

Transfers for the convenience of the parties and witnesses under 28 U.S.C. § 1404(a) must take account of all the facts and the pertinence of the proffered witnesses in order to consider the interests of justice. Here the only issues in the case are, broadly, (1) whether it is Plaintiff or Defendants that holds superior rights to the LOVE MORE trademark, and if Plaintiff does then (2) have Defendants infringed that trademark, and if so then (3) what are Plaintiff's damages from and remedies for that infringement?

What Defendants' friends and contractors have done after Plaintiff filed its successful application for federal registration of the LOVE MORE mark for T-shirts, on May 15, 2008, is wholly irrelevant to the issues and witness list for this case. Even if[5] Defendants momentarily gained superior common law rights to the mark by first commercial-scale use in the time between the filing and the issuance of More's application and *before* More commenced its own use by October 1, 2008, such rights in Defendants were trumped and lost in favor of More by the foreseeable federal statutory registration granted to More on June 2, 2009. This is made clear by the statute cited in paragraph 14 of the Complaint, 15 U.S.C § 1057(c):

---

[5] Defendants' first availability of commercial-scale quantities of T-shirts for sale likely was not in September 2008 but November 2008 or later, based on the showings in Defendants' opening memo and accompanying declarations.

(c):  Contingent on the registration of a mark on the principal register provided by this chapter, the filing of the application to register such mark shall constitute constructive use of the mark, conferring a right of priority, nationwide in effect, on or in connection with the goods or services specified in the registration against any other person except for [prior common law users or prior registrants].

Defendants have no defense to More's infringement claim under 15 U.S.C. § 1115(b)(5), since they have, by Lovemore's own admission (Ex. 4), commenced use of the mark on commercial goods only after – perhaps months after – September 13, 2008.  All such dates are well after the May 15, 2008, filing and priority date of More's successful application to register the mark.

Thus Defendants' extensive list of multiple people, not employees of Lovemore LLC, doing duplicate things are only possibly relevant if any has knowledge of any commercial scale use of the mark on the goods in commerce prior to May 15, 2008:  this requirement reduces the list immediately from 13 down to 5.  The other five persons are irrelevant because there was no use of the Defendants' mark in commerce prior to May 15, 2008.  The first two proposed witnesses listed assertedly "tested and promoted Lovemore T-shirts" in December 2007, but they did not have any Lovemore-marked T-shirts available for commercial sale.  Photographing and posting photos of one use in April 2008, by the third witness listed, is irrelevant for the same reason.  The fourth and fifth proposed witnesses listed, who wore Lovemore shirts in a TV series in April and May 2008, also are irrelevant as, again, there were no such shirts available for sale to the public in normal commerce.  Indeed, Defendants' witnesses listing, at pages 16-17 of their brief, suggests there was no live chooselovemore.com website until August 2008 and no catalog to enable commercial-scale sales until November 2008 at the earliest – this latter being well *after* More was using and selling its own LOVE MORE T-shirts in commerce from October 1, 2008.

- 21 -

Defendants' proffer of "at least 12" [*sic* – 13 are listed] and "as many as 32 New York area non-party witnesses" of this nature is plainly mere puffery – no court would allow even one witness to testify on such unimportant, non-probative miscellany at any trial, in Brooklyn or here, even if the witnesses were subject to subpoena power of the respective court.

On the other hand, at least Patty Rothman, manager of More Cupcakes LLC, and Kim Deason, lead employee of More, would testify in Chicago as to the filing of More's application, More's commercial use and sale of its LOVE MORE T-shirts in Chicago, and damage from Defendants' actions.  These witnesses have no connection as yet to Brooklyn, and to take them away from More's business for part of a week or more for a trial there would be greatly harmful to the small business operation here.  More has an active bakery and makes over-the-counter and catering sales of its perishable, fresh food products.  In contrast, Lovemore and the Crossman sisters deal only with non-perishable dry goods that need only be received, packed, and shipped by Defendants on any leisurely afternoon, whether in one week or the next (see pp. 5-6, *supra*).

**CONCLUSION**

The three motions of the Defendants, in all their parts, should be denied and the case set for commencement of preliminary matters, scheduling, and discovery.

<div style="margin-left:40%">

Respectfully submitted,
**MORE CUPCAKES, LLC**

</div>

August 26, 2009 \_\_\_\_s/JR Crossan/_____
John R. Crossan
   Counsel for MORE CUPCAKES, LLC
CROSSAN INTELLECTUAL PROPERTY LAW, LLC
   70 West Madison St., #5050
   Chicago, IL  60602-4214
   Phone:  312/602-1701
   Fax:  312/264-0770
   jrc@crossaniplaw.com

- 22 -

**Certificate of Service**

A true copy of the foregoing, captioned **More Cupcakes' Memorandum in Opposition to the Motions of Lovemore and the Crossman Defendants to Dismiss or Transfer this Case** is being served on counsel for Defendants who have appeared herein, via the Court's CM/ECF service, this 26th day of August, 2009.

            s/JR Crossan/ _____
            Counsel for Plaintiff

**EXHIBITS 1-8 FOLLOW**